I'm an assistant city attorney with the City of Austin. I'm here representing Officer Eric Copeland, a City of Austin police officer who is highly trained and skilled and experienced. Despite the tragic consequences in this case, Officer Copeland is entitled to qualified immunity from the claims of excessive force that the plaintiffs are making here. The district court in this case erred by denying Officer Copeland's motion for summary judgment asserting qualified immunity and Officer Copeland respectfully asked this court to reverse that decision. The district court erroneously denied Officer Copeland's motion despite explicitly finding that the plaintiff's appellees in this case introduced no evidence into the record to contradict the fact that the decedent in this case, Amid Bradley, was reaching for Officer Copeland's firearm just seconds before Officer Copeland managed to push him away and fire three shots. At this moment, Amid Bradley was moving back in Officer Copeland's direction and it was reasonable for Officer Copeland to believe that Mr. Bradley posed an immediate threat to his life. Now, as this court teaches in Frayer v. City of Arlington, you have to look when evaluating deadly force, you have to look at whether the officer was reasonable to believe at that moment that he was in fear for his life or in fear of serious injury. But the recent case of Mendez v. Poitouvent also puts that in a little bit of context. You also have to look at what was going on just before to evaluate whether the officer's fears and beliefs were reasonable. And the facts of this case fully support Officer Copeland's reasonable belief that he was an immediate threat of his life or facing serious injury from Mr. Bradley. In fact, Mr. Bradley was a suspected fleeing felon. He had fled from a car stop, which is a crime in and of itself, a state jail felony in Texas to flee from a car stop in a vehicle. He fled recklessly and dangerously away from Officer Copeland, pulling over a double yellow line and speeding away. Officer Copeland followed and then Mr. Bradley continued to run on foot to escape Officer Copeland. As he was running, Bradley seemed to be reaching for his waistband, and Officer Copeland had no idea whether Mr. Bradley was armed or not. He chased Mr. Bradley across in one direction, and if you've seen the video, you can see them kind of run off to the left of Officer Copeland's camera. Officer Copeland tries to pull Bradley to the ground, telling him to get down, get down on the ground. Although Bradley says, oh, I'm trying to get down, I'm getting down, he continues to run. In fact, what Copeland testifies is that Bradley tries to shove him down, and at that point you can hear Officer Copeland say, get back. He was startled by Bradley's resistance. They continue to run and chase immediately. Officer Copeland draws his taser and tries to use his taser to stop this fleeing suspected felon, who Officer Copeland believes has engaged not only in fleeing from a traffic stop, but is also suspected of serious drug crimes, and he developed that belief during the traffic stop. That was based on smelling marijuana in the car, observing baggies in the car, and Bradley's general evasiveness during the stop. The taser is unsuccessful. It knocks Bradley over, but doesn't incapacitate him in any way. Officer Copeland tries to kick him to knock him back down. That is also unsuccessful, and Bradley continues running. He tries to climb a fence on the other side, and again, this is now off camera again. They engage in hand-to-hand combat. Initially, Copeland gets him down on the ground on all fours and is trying to pull Bradley's arms out from underneath him so he can get his hands behind his back and get him on the ground and handcuffed. Bradley continues to resist. Officer Copeland uses three to five what he calls hammer strikes to strike Bradley in the torso and on the side of the head. Those strikes are ineffective. Officer Copeland, becoming tired and exhausted and alone without backup at this point, not hearing sirens, reaches to his microphone, and on the video, on the tape, you can hear, step it up, asking for backup to come. At that moment, Bradley takes advantage of Copeland reaching off of him, stands up, and puts Officer Copeland in a headlock, and at this point, there's at least one eyewitness that is called in to 9-1-1 who is viewing this fight. This eyewitness describes this fight as a fight to the death. He sees Mr. Bradley put Officer Copeland in a headlock, began to swing him around, and eventually get Officer Copeland down on the ground on all fours. The witness says Bradley takes some swings at Officer Copeland, and then Officer Copeland testifies that Mr. Bradley takes his microphone and pulls the cord across his neck in an effort to strangle him. Did the eyewitness testify to that? The eyewitness did not specifically see the cord go around Copeland's neck. Wasn't on the dash cam? Was not on the dash cam, Your Honor. But the testimony certainly doesn't rule it out. It certainly is not contradictory. I thought there was positive evidence that that did not happen. I'm sorry, Your Honor. I thought there was direct evidence that that did not happen. There is no direct evidence. No cord was put around the officer's neck, that the decedent did not touch the gun. There is absolutely no evidence in the record to contradict those things. And as I said initially, the district court specifically found that he did reach for the gun repeatedly. I'm sorry, Your Honor. You can't have findings like that at this stage. You have to take the facts as alleged. You can't resolve disputed fact issues. And there is no evidence in the record, Your Honor. What the Supreme Court has held in Scott cases is you have to take the facts as they are set forth in the record and supported by the record. Of course, the plaintiffs can't rely on some metaphysical doubt to the facts. And they have to have citations to evidence in the record to contradict the evidence put forward by the officer in support of his motion for qualified immunity. There is simply no evidence in the record to contradict Officer Copeland's testimony that Bradley reached the cord across his neck. And, in fact, some of the physical evidence supports that. They found Bradley's DNA on the junction where the microphone ripped off the cord. Both of the eyewitnesses report seeing Bradley reach for Officer Copeland's gun. Officer Copeland, in the moments after this happened, is on a video saying he was reaching for my gun. All of that evidence is undisputed. There is simply no evidence in the record to dispute that. JUSTICE KENNEDY Is there any evidence in the record from any other witnesses to the contrary? We have the police officer's version of what happened. And I think there are two witnesses that seem to support at least part of what the officer said. Is there any other witness or anyone else that might contradict either the police officer or the two eyewitnesses? No, Your Honor, there is no other witnesses. There are two eyewitnesses and there is the police officer's testimony. We also have the physical evidence in the case. The physical evidence in the case involves, for instance, people seeing in pictures of the microphone ripped off the cord, which is what happened when it was reached across Copeland's neck. Copeland pulled on it, and it's likely that Mr. Bradley was holding the microphone and it ripped off the end of the cord, which is why the pressure was immediately released off of Copeland's neck. So that physical evidence supports that. And the eyewitness testimony and Copeland's testimony absolutely supports the evidence that Mr. Bradley was reaching for Copeland's gun repeatedly in the moments before Copeland managed to push him away and fire. There's simply no evidence in the record to the contrary. And the district court found there was no evidence in the record to the contrary, which is one of the only factual findings that the district court made in this case. The video does not show the final altercation. What does the video show? Does it show any of the situation? Well, Your Honor, it shows some very important parts of the encounter. It shows the initial traffic stop in which Copeland and Bradley have a polite, relatively polite for a traffic stop. There's no conflict, no verbal conflict between the two until Bradley, Copeland asks Bradley to step out of the car when he's going to search it, and Bradley flees. I think that's a crucial point because what you hear, what you see a lot that the plaintiffs and appellees are alleging in this case is that Bradley was somehow legitimately scared of Officer Copeland. I admit, I did not go back to the record and read the pages cited, but pages 16 and 17 of the appellee's brief, they're talking about what Zachary Rife said, and they're saying he affirmatively said the cord was not used, that Bradley never reached for or touched for the gun. I mean, that's what their brief says. Yes, Your Honor. I understand that is what their brief says, Your Honor. I think the plaintiffs here have miscited to the record on numerous occasions, and there are many citations to the record in Rife's testimony where he absolutely contradicts that. And, you know, I'll say that if you look at ROA 820, 845, and 846, that's Mr. Rife's testimony where he says on two occasions he saw Bradley reach for the gun. What Mr. Rife says is he actually grasped the gun or not, whether he had his hand fully around it and was pulling on it, but he says repeatedly in his testimony that he was reaching for it. Mr. Rife also testified that at no point did Bradley surrender, and he also testified that were he in Copeland's shoes based on what he had seen, he would have done the same thing, that he thought Copeland was in legitimate fear for his life because Mr. Bradley was trying to take his life. He described it, Mr. Rife, as a fight to the death. Brenda Miller, the other eyewitness, also said the officer was on the ground and Mr. Bradley was reaching for his gun, and that's in her recorded 911 call at the record of 822. So those are the record citations which fully support the idea that, or fully support the fact that Bradley was reaching for Officer Copeland's gun. Now, I'll say that the Plaintiff's brief has a number of assertions that are simply not supported by the record. And, you know, candidly, I don't think the district court did this Court any favors in reviewing this case because it did not make detailed factual findings or factual, do a factual sort of layout of what happened in this case. If you look at the case of Thompson v. Upshur County, what it says is, which is a Fifth Circuit case, what it says is when the Fifth Circuit is kind of faced with a situation where the district court hasn't identified the genuine issues of material fact, this court can scour the record and go back and look and see what those genuine issues might have been. Or, alternatively, it could send the case back to the district court to make those findings. And I'll say, I think it's important to note that in another recent case that came to this court out of this same district court from this same judge called Brothers v. Zoss, which is another excessive force case decided in August, this court reversed the district court based on a very similar order where the district court did not really identify specifically the genuine issues of material fact, but had a very similar order saying things like you have to put the evidence in front of the jury and judge credibility and those sorts of things, which I think is just not appropriate on summary judgment. I pointed out the case of Mendez v. Pointevent earlier, which I think is a really important case. Of course, it's the plaintiff's burden here to pierce qualified immunity, and to do that they have to point to facts in the record which would show that Copeland is either incompetent or acted in contravention of clearly established law. Mendez v. Pointevent is a case that's really on all fours with this one. In that case, a Border Patrol officer was trying to make an arrest and got into a very serious fight with the arrestee. The arrestee was grabbing for the Border Patrol officer's weapon, managed to strike the Border Patrol officer and run off as the Border Patrol officer was dazed and exhausted from the fight. The Border Patrol officer fired two shots, hit the arrestee in the back twice, killing him from a distance of 15 feet. In this case, the facts are far more extreme. There had been a two and a half minute fight and chase between Copeland and Bradley. Copeland was alone, exhausted from this fight. He had been in a disadvantageous position against Bradley for at least a minute. Bradley was reaching for his weapon. When Copeland pushed him away, Mr. Bradley was coming back in his direction and Copeland fired from a distance of 6 to 36 inches. Mr. Bradley was right on top of him. If he had waited a second longer, the hand-to-hand combat could have continued and Copeland could have lost his life. All right. You saved time for rebuttal. Thank you, Your Honor. Mr. Taylor. May it please the Court, I'm Bobby Taylor. I represent the plaintiff in this case and I'm just going to kind of go away from my script a little bit and just kind of tell you what actually happened in this case. But you need to give us record sides. I will. I represent the family and this occurred where, and I was undisputed, Mr. Bradley was driving home and it's alleged that Mr. Bradley had loud music playing from his car. It's alleged that Mr. Copeland heard the loud music and decided to pull Mr. Bradley over. There's no disagreement that Mr. Bradley stopped immediately. I think the record's evidently clear throughout that it was approximately 20 seconds after the stop occurred that both gentlemen were standing there. It is undisputed that Officer Bradley, I'm sorry, Officer Copeland admitted in depositions that they had just recently had a shooting and this is found in the record in, they recently had a shooting and this is found in ROA 1194 in the record of appeal where two black men had just been killed in the same area in Austin. And I asked Copeland at the deposition, are you familiar with these shootings that just happened in this area? He says, yes, I'm familiar with them. And I said to him, what do you think was in this black man's mind when you pulled out and 12 seconds after stopping him saying, I'm going to fucking shoot you? Because that's what happened. He stopped the car. That wasn't 12 seconds after he stopped it. After he ran. I'm sorry. That was after he had already gotten in his car, driven off. Yes, ma'am. Like a crazy person going, you know, driving erratically. Then they had the fist cups. So that wasn't 12 seconds after the initial stop. The initial stop was approximately 7 minutes. At that point, there had been no ticket issued, and that's when Officer Copeland says he smelled a stale odor of marijuana. That's when he said, and I think his hand signals, and it's in the video and I'll give you that, was that there's something white on your face. What's that white on your face? White. 20 seconds after the stop, he says he suspected this person to be a drug dealer, have major drugs in his vehicle. That's when Mr. Bradley drove off. Mr. Bradley drove off and the video catches this. Mr. Bradley, and the video catches the stop. Mr. Bradley drives off. Mr. Bradley gets out of his car, and then 12 seconds after he gets out running, the video captures Officer Copeland saying, I'm going to fucking shoot you. The video also has Mr. Bradley saying, I'm trying to get down, I'm trying to get down. The video also captures Mr. Bradley, and the time frame is somewhere 648.09, continuously saying, I'm going to shoot you, I'm going to shoot you. Now, at that point in time, it's undisputed that Mr. Bradley had been on the ground, and I'll give you the site to where he was on the ground being kicked and struck. And when I said to Officer Copeland, and the reference is 1194, what was your thought when you said to this black man, I'm going to fucking shoot you, and I said, were you serious in tone? He said, yes. Were you serious in what you said? He said, yes. And I said, so what was your thought when he said this? And he says, when I said that, what he did was push me off and took off running basically eastward. So at that point, now, prior to Mr. Bradley, which this part of it was off the video, but you could hear the conversation. Prior to that time, Mr. Copeland admits that he was kicking and stomping Mr. Bradley. There's no dispute. He says that when he had him down, he says there was never a time Mr. Bradley hit him. He says in the record, he says, I asked him, did he ever pull a weapon or take any assertive actions against you at any point at ROA 1196? No. Did he ever hit you? No. Did he ever do anything to put you in fear? No. During this entire incident, did he ever hit you or physically do anything to you? He says the one thing he did was he pushed off, but he pushed off when he was attempting to run away. That's clear, undisputed. Now, it's also undisputed that Copeland beat Mr. Bradley. There's no question. I asked him, counsel just said three to five hits. Actually, it was he had no idea how many blows, and that's found at ROA 1197. He says when Mr. Bradley pushed him, that was the only allegation of contact initially, that was found at 1197. He says he pushed him simply trying to get away. He says 1197, he was never struck at all by Mr. Bradley. And then at 1326, Officer Copeland admits kicking Bradley around his right and left eye when he was down. He admits striking him continuously, and he admits that all of the bruises, and we have photographs that are in the file, ROA 1202 and 1326. He admits that the only person responsible for the injuries to Bradley, which included the beatings, the kicking around the face, the kicking around the body, was him himself. So that's going to be ROA 1202 and 1326. Now, counsel talks about the fact there were no other witnesses. Well, first of all, the video catches Officer Bradley running up and kicking Mr. I'm sorry, Officer Copeland kicking Mr. Bradley when he's down. Officer Copeland admits he hit Mr. Bradley around the head with his taser at least two times and continuously beat him to cause the physical damage that's shown in the photographs which are there. But the taser gun didn't tase him. I'm sorry? The taser gun didn't actually tase. Yes, ma'am. The taser, he shot the taser. The taser did not tase him. But once Mr. Bradley fell to the ground, you see on the video he's taking the gun and he's hitting him, and he admits in depositions, and we've got those references in our brief, he hit him at least twice, and he says he gave him rabid punches, multiple punches, but the physical damage that we have alleged is an excessive force is all matters that he admits to, and those references are in there. So there's no question about that. As to the shooting itself, that was not caught on the video. That was something that occurred that was, well, there's physical evidence. First of all, you asked about proof. There's no DNA on the gun, even though you've got photographs there that show Mr. Bradley says, I'm sorry, Mr. Copeland says Bradley had his hand on the gun, and they did a walkthrough. They did a reenactment, and that was done a month later. And that shows, according to Mr. Bradley, I'm sorry, according to Officer Copeland, that shows Mr. Bradley's hand on the gun. It shows Mr. Bradley's hand on the trigger, and Mr. Copeland says that the lip, which is what holds down portions of the gun, was removed off the gun by Mr. Bradley. The city's DNA expert says Mr. Bradley's DNA was nowhere on the gun, nowhere on the holster, nowhere on the hood, nowhere on the gun belt, nowhere on any part of the gun or the weaponry or anything that is shown in the photographs. Obviously, we've given you all the pictures and all. Nowhere on there. That's their DNA expert who says nowhere. Mr. Bradley wants to allege, I'm sorry, Mr. Copeland wants to allege that my client took his radio cord and wrapped it around his neck, and he says he grabbed it with both hands and pulled it off. His DNA was nowhere on the radio cord. City of Austin detectives. Well, I thought he said it was on the juncture where the microphone had ripped off. On the mic, there's a little juncture there where the cord itself fits into. Opposing counsel said that your client's DNA was on, well, Mr. Bradley's DNA. It was on the junction place where you screw the cord into, but the actual microphone itself, which was taken, DNA samples taken, had no proof of my client touching any part of that, and it didn't have any proof that Mr. Copeland, who himself said he took both hands and pulled it off, had touched it. But at the same time, we've got an eyewitness. Mr. Reif was 20 to 30 yards away, 20-20 eye vision. He watched the whole thing. Sites are there. He gives a description that he saw, and there was never a radio cord possessed by my client. He saw there was never any point where my client touched or hit or struck in any way, shape, or form in any time frame that my client struck Mr. Copeland. What he does say is there was two occasions where he thought that my client may have been reaching for the gun. But then his quote is, but it looks like when he got about six inches that he rethought that and pulled back. Those quotes were in there. He says he thought, 20 yards away, that he may have seen my client in all this struggle reaching for the gun, but then his words are that he rethought that and said, no, I shouldn't do it, and pulled back. But that was six inches away. Again, that's in here. That's the eyewitness. The eyewitness says he saw them both, the whole struggle. There was never a time that there was a radio cord. But, in fact, what he does describe is that my client continuously trying to get away, my client never reaching for Mr. Copeland, and as my client was breaking away, Officer Copeland grabbed his leg, knocked him down, got on top of him, had his elbow under his neck, had his feet over Mr. Bradley's feet, and was on top of him. He then was still trying to get away. Well, Mr. Bradley was trying to escape the beating that he had already been getting, which is evidenced in the photograph. But he tried to escape in the car before there was any altercation. Yes, ma'am. So he was always trying to get away. He was trying to escape in the car initially. He got out of the car, and at that point is when the beating that is clearly acknowledged. Let's get past that. He was where, according to Reif, when the shots occurred? When shots occurred, Mr. Bradley was laying flat on the back. He says the only thing that was off the ground was his shoulder, two or three inches off the ground. He says his feet, his butt, everything was flat on the ground. He says Officer was on top, had his elbow under my client's throat, and had his feet blocking my client's movement. He says that Officer Copeland got up, backed away five feet, and then fired three shots into my client as he laid on the ground. That's his sworn testimony. Now, Kareem. Kareem is the city's ballistic expert. He states that the way Officer Copeland describes this is an impossibility. He says it couldn't have happened. He's got photographs that, again, were taken at the reenactment. Now, these were before any lawyers got involved. This was strictly Officer Copeland demonstrating what occurred. And in ROA-1229, Kareem, who is your ballistics expert, says to get to the mid-chest where this is alleged to have occurred would have been an impossibility. It couldn't have occurred. He also alleged that the photographs and reenactment were incorrect because the reenactment shows the bullets going right to left to the body. Two bullets went straight in. The third one went to the side. But according to the photographs, 35-00 and 35-01, the bullets went right to left. But the autopsy, the medical examiner, says all the bullets went left to right. So there's no way it could have been the way Copeland says because the trajectory of the bullet was opposite. And that's found in 12-30 when he says the photographs is going to be right to left. But the autopsy and actual direction was left to right of the bullets. Additionally, the photographs, 35-01, show Mr. Bradley supposedly on the ground, supposedly coming up with his hand down here. We've got Kareem, who was their ballistics expert. We've got two other experts all saying that that couldn't have happened because that other bullet went in the side here. And if his arm is down here, going in the side could not have occurred. So he is saying because of that, it couldn't have occurred that way. And thirdly, the trajectory of the bullet, he says, could not have occurred according to the way Copeland is saying because we would have found the bullet if it occurred the way he says. Again, that's ROA. There's evidence that Copeland, it didn't happen the way Copeland said, in terms of where the bullets entered. What's, but that doesn't necessarily mean that he wasn't in fear for his life. Copeland wasn't? Yes. I asked Copeland, were you in fear of your life? And Copeland said throughout his deposition he was not in fear. From the time he stood at the door, he was not in fear. I asked him, was there anything done to you at any point by Mr. Bradley? And he says the only thing that he did to me was, first, when he pushed away to run, he says that put him in fear because he shouldn't have run. He never had anybody run. And he said, secondly, when he had the cord being wrapped around his neck. That was the only time he indicated fear. And we have no evidence the cord, because of DNA, was ever in touch with his neck. We have no evidence that he grabbed it. And in addition, we have an eyewitness. An eyewitness did say he watched and he said that cord was not put around his neck. I asked him, did you see a cord around his neck? What page is that? I'm sorry? What page is that? That's going to be Reif. Reif is going to be at ROA 145, 146. And Reif also said he reached for the belt area around the gun area. He says at one time he started to go for the gun, got about six inches away, realized, and then pulled back. Those are Reif's words. Reif said at ROA 728, he sensed Bradley was saying to himself, I shouldn't be doing this, and pulled away. And how much time passed in between that moment and the shooting? That would have been prior to the time that Bradley was on the ground, on his back, and prior to the time that Copeland was on top of Bradley. And so in terms of ‑‑ Reif said he ‑‑ all right, so how many seconds in between when Reif said he saw him rethink it, get within six inches and pull back, how long after that did the shooting occur? And, Your Honor, the best I can do is give you a guess because there was no time factor that Reif could give. But Reif described that as something that happened when they were tussling, when they were running around, when Mr. Bradley was on the ground. That's when they were tussling. And he says at that point Mr. Bradley tried to break away. He says Mr. Bradley tried to break away. That's when officer reached out and grabbed his leg, pulled him down, and then the officer got on top of him. And when the officer got on top of him, he had his elbow under the officer's neck. He had his feet on the officer. At that point in time, after being on top for a few seconds, he stood up, backed up five feet, and shot three times into Mr. Bradley. So as far as a time factor, I'd like to sit here and say seven, eight, ten seconds, but that happened before Mr. Bradley tried to run away that last time and was tackled and brought down. Then the officer got on top. He says at ‑‑ and, again, that was ROA 145, 146. He says at ROA 728, Bradley was flat on his back, was not moving upward or toward Copeland when Copeland shot him three times. He says his back and his butt were flat on the ground, and he says photographs 3501 and 3500 do not reflect what happened. And he says there was never ‑‑ and I asked him, did Bradley ever have anything in his hands, including a gun, a radio cord, anything? And he says at 70145, he didn't have a radio cord. He never touched the gun or the holster. He did not strike or hit Copeland. He never possessed anything in his hands and did not attempt to choke Copeland. And, again, that's at ROA 145, 146. The other witness we had, and Elizabeth Morris was your DNA expert, who testified about finding no DNA of any kind on the gun. Now, according to the pictures, Mr. Bradley had his hand on the gun, the back of the gun, the butt of the gun. There was no DNA there, not on the holster. And that's totally contrary to the photographs that were in evidence. Was Copeland's DNA on it? On what? The gun or the holster. I believe Copeland's was on the gun. It was not on the holster, and it was not on the cord that went around the neck. The other expert we have was our reconstructionist, and her name is Johnson. And she testified, Janice Johnson, she testified that she did a reconstruction, and he says the left arm of Mr. Bradley, if it had been the way Copeland says it would have, would have prevented that bullet from going into his side. She says it's an impossibility. She says this at 1215 through 1217, also at 1222 of the record. She says it's an impossibility for it to occur the way that it is being told. She says the relative position of Copeland is not consistent with physical evidence, not consistent with the range of fire, not consistent with the reenactment, not consistent with the recovery of projectiles. And she says what Copeland alleges occurred that day involving these two is an impossibility. So we've got these witnesses. Now, they talk about another witness. The other witness was a lady by the name of Ms. Miller. Ms. Miller called, and she gave a 911 phone call, and she says there's something going on, and it's dangerous, and I think the man is going for the gun. She has refused to testify. I will not try to talk to her. There's an affidavit or a statement in the file, and it's before the court, where she says I don't want to have anything else to do with this. I just don't want to have anything to do with it. It's making me sick. So Ms. Miller has refused to be for deposition. There's a motion before the court to strike her because she's made it clear she does not want to be involved in this case. Seven minutes at the car, 12 seconds after Bradley drives off, he is being told I'm going to shoot you. Sixty seconds later, he's being told I'm going to fucking kill you, and this is all at a time that Copeland admits Mr. Bradley never struck him, never hit him, never threatened him, never physically put hands on except the one time when he was pushing off. Mr. Copeland says my time is up. I just want to say to you that the concern I have is very simple. I asked Mr. Copeland, do you have any recollection of ever stating to anybody prior to this date that I'm going to shoot you, and it was not your intention? He says I have no recollection. My next question, do you have any recollection prior to this date of ever saying to anybody I'm going to kill you when you were not prepared and ready to do that? He says no. So 12 seconds after Mr. Bradley ran, he was prepared to shoot him, and he admits. Sixty seconds later, he's prepared to kill him, and he did. Thank you. All right. Thank you, Mr. Taylor. Mr. Copeland, you have five minutes for rebuttal. Well, Your Honors, I guess I'll admit this. This Court has its work cut out for it today because Mr. Taylor and I are reading two separate versions of the record. That's all there is to this. I ask this Court, on behalf of Mr. Copeland, to go back and review all of these record citations carefully. For instance, Mr. Taylor just told you that Copeland's DNA was on the gun. That's just not true. The DNA expert on page 892 found that neither Copeland's nor Bradley's DNA was on the gun. And what happened? Well, just because you touch something doesn't mean your DNA is on it, right? Of course, Your Honor. And this Court held in Glasgow v. City of Austin that the absence of DNA does not mean that something that a person didn't touch an item. Well, that's the point. It was Copeland's gun, and you'd expect his to be on there, and it wasn't. So that's just a neutral – that doesn't really tell us anything. Well, what it tells you – One way or the other. What it tells you is that Bradley still could have touched the gun. Exactly. I mean, that just – it doesn't cut one way or the other. You know, and so Mr. Taylor talked a little bit, too, about this alleged kicking and stomping that Copeland did of Mr. Bradley. That's just not borne out by the record. As I talked about initially, they run off to the left, and there's the encounter where Bradley – Well, there's no other witness to this when we run off to the left, Your Honor. Well, I don't care what happened then, either. What I'm focusing on is what happened surrounding the shooting. So do the expert witnesses that were deposed, does that seem to contradict Officer Copeland's version? So the contradictions Mr. Taylor speaks of are due to this reenactment photograph. About a month after the incident, the investigators who were investigating the shooting kind of had a hard time understanding the dynamics, the physical dynamics of the fight between Bradley and Copeland. The police investigators? Who were the investigators? They were police investigators, yes, Your Honor. They were having a hard time understanding the dynamics. And when you look at some of the pictures, you see why. They were in a very sort of unusual position where Bradley was on top of Copeland but kind of facing away, and they were sort of on all fours against each other. It's very hard to describe without seeing it. But a very dangerous position for Officer Copeland because he couldn't see. He was underneath Bradley's torso. In any event, Judge, to answer your question, during the reenactment, there's a picture or two of Copeland pointing a fake weapon at the individual who was reenacting Mr. Bradley. And what the plaintiff's expert says is that it's a little bit too far away. The distance is not 6 to 36 inches, which I think is a fact that actually cuts in favor of Officer Copeland. They were right on top of each other just after a fight when Copeland fired. And the other fact, which Mr. Taylor mentioned, was that it showed the wrong angle of entry for the bullets. So we're talking about right to left instead of left to right. So we're talking about a couple of feet this way versus a couple of feet that way. It's not a material difference, Judge. What about did Reif say that Bradley was on the ground, on his back, not doing anything when Copeland stood up and shot him? So, well, we have to put it in context. Did he say that or not? Well, he did not say. He said Bradley was on the ground just after he'd been pushed away. His shoulder was off the ground. Their expert also says that the evidence is consistent with the two getting closer together as the bullets were fired. And Copeland aversed that he was standing straight up as he was firing, which indicates that Bradley was moving slightly closer to him. And we know that because there's no powder marks on what she thinks is the first entry under the arm, but there are the 6 to 36-inch powder marks on his chest as he's getting closer and coming towards Bradley. What was the distance between them? In terms of how far apart on the body? Of the two men, how far apart were they when the shots were fired? You said in terms of Bradley. I thought you said Copeland was standing up and then Bradley was raising his shoulder. Was Bradley coming toward Copeland? Bradley was coming towards Copeland. If Copeland was standing straight up, Bradley was coming. Did Reif's version of what he saw agree with that or not? Well, Reif said his shoulder was off the ground. Reif couldn't say whether or not anybody was moving. What Reif certainly said is that they had just engaged in a fight to the death. And Mr. Taylor talked about the idea that Reif said he got within 6 inches but pulled away. When you read Reif's testimony, what he says is there were multiple occasions when Bradley was reaching for the gun. In the first instance, he only got close. And according to Reif, said, oh, maybe I shouldn't do this, so I pulled away. But in the second instance, he's reaching again. And it's that second instance where Copeland feels it and they're fighting and Copeland manages to push him away. And that's the moment that puts Copeland in a reasonable fear for his life. No officer should have to engage in a fight with somebody who's just been reaching for his gun. And for that reason, I respectfully ask this Court to reverse the district court and render the decision in Copeland's favor. All right. Thank you, sir. We have your argument. All right. We'll take a 10-minute recess.